· GOLD HUNTER MINING & SMELTING CO. v. JOHNSON.

(Circuit Court of Appeals, Ninth Circuit.    July 3, 1916.)

No. 2667.

1. MASTER AND SERVANT ⬯118(1)—INJURIES TO SERVANT—SAFE PLACE OF WORK.

Where miners were required to use ladders going through tunnels to the levels on which they worked, it is the duty of the mine operator to use reasonable care in furnishing and keeping the ladders in a safe condition, so that the miners might reach their place of work.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 209; Dec. Dig. ⬯118(1).]

2. MASTER AND SERVANT ⬯127—INJURIES TO SERVANT—DUTIES OF SERVANT.

A miner, whose duties consisted of drilling, is not required to repair ladders necessary to enable him to reach the level on which he worked.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 252; Dec. Dig. ⬯127.]

3. MASTER AND SERVANT ⬯289(16)—INJURIES TO SERVANT—JURY QUESTION.

Whether a miner, injured while walking on the lagging in a manway leading from one level to the other, was guilty of choosing the most dangerous way merely for his own convenience, instead of using other ways, held under the evidence for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1107; Dec. Dig. ⬯289(16).]

4. TRIAL ⬯139(1), 140(1)—PROVINCE OF COURT AND JURY—CREDIBILITY OF WITNESSES.

The credibility of witnesses and the weight of their testimony is for the jury. ·

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 332, 333, 334, 338–341; Dec. Dig. ⬯139(1), 140(1).]

5. MASTER AND SERVANT ⬯221(4)—INJURIES TO SERVANT—ASSUMPTION OF RISK.

Ladders in a manway in a mine leading from one level to another were broken, and plaintiff, a miner, was injured while making his way from one level to another by walking on lagging or planks in the manway. He had pointed out the defect to his boss, and had been assured it would be remedied, and was told in the meantime to use such planks. Held that, as it was the only practical way furnished, he did not, during the interim, assume the risk of injury from the use of such way.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 642; Dec. Dig. ⬯221(4).]

6. MASTER AND SERVANT ⬯289(34)—INJURIES TO SERVANT—JURY QUESTION.

Whether a miner was negligent in carrying his drill with him as he made his way by planks from one level of the mine to the other held under the evidence for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1126; Dec. Dig. ⬯289(34).]

7. MASTER AND SERVANT ⬯288(15)—INJURIES TO SERVANT—JURY QUESTION.

What is a reasonable time for a master to make needed repairs to a ladder used in a mine held under the evidence for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1085; Dec. Dig. ⬯288(15).]

⬯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. MASTER AND SERVANT ⬉══289(15)—INJURIES TO SERVANT—JURY QUESTION.
   Whether the danger of using planks in a manway in a mine in place of the ladder, which had been broken, was so obvious that the miner was guilty of contributory negligence, though repairs had been promised, *held* for the jury.

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1106; Dec. Dig. ⬉══289(15).]

9. TRIAL ⬉══260(8)—INSTRUCTIONS—REFUSAL.
   Where, in a servant's action, the jury were charged that he assumed the risk of injury from dangerous conditions in his place of work, unless he continued work in reliance on a promise of repairs, the refusal of an additional instruction that the servant assumed such risks was not error; it being covered by the one given.

   [Ed. Note.—For other cases, see Trial, Cent. Dig. § 657; Dec. Dig. ⬉══260(8).]

10. TRIAL ⬉══252(1)—INSTRUCTIONS—ERRORS.
    In a servant's action, where assumption of risk was relied on it is not improper for the court, in explaining the matter to the jury, to illustrate the doctrine by references to more simple employments and the most simple appliances.

    [Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 596, 612; Dec. Dig. ⬉══252(1).]

In Error to the District Court of the United States for the Northern Division of the District of Idaho; Frank S. Dietrich, Judge.

Action by Edward Johnson against the Gold Hunter Mining & Smelting Company. There was a judgment for plaintiff, and defendant brings error. Affirmed.

James A. Wayne, of Wallace, Idaho, and J. F. Ailshie, of Cœur d'Alene, Idaho, for plaintiff in error.

Walter H. Hanson, of Wallace, Idaho, and John P. Gray, of Cœur d'Alene, Idaho, for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge. Edward Johnson, defendant in error here, but who, for convenience, will be called the plaintiff, recovered verdict and judgment against the Gold Hunter Mining '& Smelting Company, plaintiff in error here, but who will be called the defendant, for injuries received while he was working in the defendant's mine in Shoshone county, Idaho, on October 17, 1914. Writ of error is brought by the defendant company.

Plaintiff was a machine man on the night shift on the 400-foot level of the mine. He alleged that, finding his drill out of repair, it became his duty to take the drill to the level, and along the level to the shaft, and thence to the main station in the mine on a higher level, and exchange it for another drill; that in order to reach the shaft he had to go down from one floor to another of the 400-foot level; that manways had been provided for reaching the floors above the 400-foot level, and that to enable employés to go from the level to the floors above ladders were constructed and installed; /that in the stope were two manways, one extending from the 400-foot level in the westerly end of the stope 'forward to the third floor, and the other extending

⬉══For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

from the 400 level toward the easterly end forward to the fourth floor; that the manway in the westerly end of the stope had not been extended to the fourth floor, and because of a large chute extending from the third floor down to the 400 level, and a slide chute from the bottom of the third floor to the fourth floor, which covered the width of the floors, and because of the opening at the top of the chute on the floor of the third floor, and a large broken floor area, plaintiff found it impossible to go from where he was working to the manway in the west part of the stope, and the only way to reach the 400 level was downward in the easterly end of the stope and east of the large chute; that the stopes on the floors had been extended somewhat easterly from the manway, and the face of the solid ground on the east extended somewhat beyond the timbering on the floors; that ordinarily the way to go from the fourth floor down to the 400 level would be by the manway in the easterly end of the stope; that plaintiff, after taking down his machine, took it to the manway and down from the fourth to the third floor by the ladder; that the ladder from the second to the third floor had been broken by a rock fall two or three days before, and had not been repaired, and there was no way of going by the manway from the third to the second floor in the east end of the stope except by way of a plank or lagging 8 inches in width, which had been laid by the defendant at the easterly end of the floor, then walking along the plank from the third floor to the face of the stope in an easterly direction, and then back in a westerly direction along the slope of the face of the stope to the second floor; that the lagging was inclined downward from the third floor toward the face, and was insecure, with no rails or guards; that under the lagging the second floor had not been timbered out to the solid ground, but had an opening from the lagging downward to the first floor or solid ground; that plaintiff, having no other way provided by defendant, went along the third floor to the lagging or plank, and while walking along the plank, and because of the negligence of the defendant in providing such unsafe way, plaintiff either slipped, or the lagging turned slightly, throwing plaintiff off and downward 20 feet to the first floor, with the steel drill falling on top of him and injuring him; that on the shift before that on which plaintiff was hurt plaintiff called the attention of the shift boss to the fact that the ladder between the second and third floors was broken and that it was necessary to repair it, and that the shift boss promised plaintiff that he would cause the same to be repaired and replaced, and would speak to the foreman of the mine, and that it would be replaced, and gave assurances to plaintiff to that effect; that he told plaintiff to use the way which plaintiff was going at the time of his injury until the ladder was replaced and the manway repaired; and that plaintiff, relying upon the promise of the shift boss to repair, continued in the employ of the defendant.

The defendant admitted that by falling from the lagging plaintiff was injured, but denied all charges of negligence or carelessness. Its contention was that the so-called east manway was not permanent, but was built for use of miners to permit them to get to the chute near

the east manway to clean the same; that defendant furnished its employés with a safe manway, provided with proper ladders, near the west end of the stope, and the only proper way for Johnson to have descended from the place where he was working on the fourth floor to the sill floor on the night he was injured was to use the ladder from the east end of the stope from the fourth to the third floor, then go along the third floor, passing the timber slide, ore chute, and inclined chute, to the west manway, and go down by means of this west manway upon the ladders. Defendant also pleaded that it did not know of the existence of this plank until after the accident, and denied that plaintiff had ever notified the shift boss of the existence of the plank, or made any complaint whatever, and further alleged that it had provided a rope and windlass in the timber slide for the purpose of sending machines up and down between floors, and that plaintiff ought to have used this timber slide in sending down his machine, rather than to have carried it. Contributory negligence and assumption of risk were also pleaded.

Upon the trial John Holmi, a mucker, working on the 400, or highest, level in the stope with Johnson on the night of the accident, described the four floors in the mine, and said that he was standing on the muck pile, that there was an ore chute extending through the second and third floors down onto the level, and that there was a slide chute diagonally from an old chute to the fourth floor. Holmi said that he was mucking ore down the slide chute; that there was a hole in the fourth floor, and that the ore ran down into the ore chute; that the slide chute was not very wide, but was filled up between the posts, about 8 feet long, 4 feet or less; that the top of the ore chute was open approximately 3 feet across the drift, and that the opening of the ore chute extended across the stope of the floor, he thought, the whole way; that there was muck about the opening; that he saw the ladders extending to the third floor; that the manway on the west side extended up to the third floor; that the ladder between the second and third floor on the east side was broken several nights before Johnson was hurt; that on the night Johnson was hurt he could not get up the ladder, because it was broken to pieces; that there was muck and rock around it; that on the night of the accident he went to the first floor by the ladder, and to the second floor by the ladder, and then went over to the face and went up by the lagging from the face onto the third floor, and then went up a ladder to the fourth floor; that that was the best way, as the other manway was so dangerous a man might kill himself going over the chute; that between the posts and the wall about the slide chute on the night of the accident it was full of muck; that Johnson started to drill holes, and, saying he had to get a better machine, took his machine to go down the way Holmi says he (Holmi) had come up; that the next thing he knew was a call from Johnson, who had fallen to the first floor; and that he found Johnson on the first floor with the machine on one side of him. Witness said that the plank from the third floor was about 6 feet long and 3 inches thick and 8 inches wide; that there was no rope or railing or guard; that he helped himself down with

his hand, and walked along and came to the second floor; that the first night he worked there he went from the second floor up to the third floor on the ladder, which was afterwards partly broken; that he knew there was a west manway completed from the sill floor to the third floor, but that he never went in that way, except on the first night; that on the night Johnson was hurt he could have gone up the west manway to the third floor, but that he could not walk along the third floor past the slide chute to the wall near the easterly end of the slope and up that ladder to the fourth floor, because they had to come between the posts over the slide and the hole was open. Witness then attempted to describe the space between the walls or the side of the stope on the third floor and the timber slide, but it is difficult to apply his descriptions, because he referred to a diagram and evidently used his hands to illustrate his meaning. But, as we understand it, he said there was nothing on one side of the wall, and on the other side there was some space down near the bottom—about 8 inches wide. Witness said that the side or wall of the stope went upward on a slant; that the first night he worked there he stooped and went sidewise, but passed between the side of the stope or the wall of the stope and posts; that the lagging was 6 feet long, with the upper end on a cap, the lower end on a rock edge of the stope, the decline being 2½ to 3 feet.

Johnson, the plaintiff below, after stating that he was 33 years old and was an experienced miner, testified that he had worked several weeks on the fourth floor on the 400 level; that Steve Shaw was his shift boss; that he started to drill, but that his machine leaked, and that, in accordance with the general order of the shift boss, previously given, he was taking the machine to the station to get another one; that when he went to work that night he went up the ladder on the east end of the stope from the drift to the first floor and out, and then up to the second floor; that the ladder from the second to the third floor was broken; that the plank was there, and the rocks had come down out of the hole through the manway and broken the way; that he went over to the face and walked upon the plank or lagging onto the third floor; that he then went up the ladder to the top floor; that the ladder was partly broken the third night before; that the night before the injury the hole was blocked up, and he went up by the face and the plank; that the only way he could go up was that way, because the slide chute was across the stope on the third floor, and the men could not come by the slide chute, because behind it it was filled up with muck. Johnson, continuing, said:

"There was a little hole between the post—the posts was laying straight here (indicating), but there was a little hole down on the bottom of the posts, between the ground and this post, but that was all filled up with muck the night before I got hurt already. I couldn't get by that nohow. I don't see no chance to get by."

He said that Shaw, the shift boss, came up and asked him how he (Johnson) got up; that he said to Shaw, "You have to go like a rabbit on the timbers here, but you better get a ladder here," and that Shaw said:

"Yes, I get the timber men to put the ladder over there. * * * You go that way now, on that plank, so long as the timber men come up here. I get the timber men up here as quick as I can, to put that ladder there."

Witness said it was the duty of the timber men to put the ladders up; that timber men worked on the night shift at that time. This question was then asked:

"Q. Was there anything else said about ladders? A. No; he said he go and fix that. He said he give the foreman orders already the day before; that he sent the ladder in, you know; that he gave orders to make the ladder and send in the ladder."

The ore chute was described by Johnson as made between the posts and the wall. He said that they had to open up the floors, and then the rock broke the floor more, and the whole floor was up, and that the sides filled up with muck, about eight inches on the side along the wall; that there was muck on the plank, the muck going over the chute on each side; that the slide chute extended from post to post; that the ore chute was open across the drift, with only a narrow plank on one side, the other side being broken to the hanging wall; that around the top of the ore chute there was rock lying around; that there was about eight inches of space on the hanging wall side; that the manway on the west end only came up to the third floor; that he had to use the way he did the night he was hurt the night before for the first time; that when his machine leaked he took it on his shoulder and walked as long as he had room to walk with the machine on his shoulder, and then he took it in his hand when the ground was too low and had to bend down and "pack" it in his arms; that he went on the ladder down to the third floor and walked through the third floor to the end and walked a little ways on the plank, "and then I don't know how it happened: I don't know if that plank turned a little and my foot slipped—everything happened so quick that I couldn't tell which way it went there." On cross-examination Johnson said that he had worked on the second and third floors, and after stoping out rock and ore for the height of a floor, they had put in a manway and put a ladder in; that he knew there was a manway to the third floor provided with ladders; that the ladder in the east manway was broken; that he had previously gone up the west manway; that the timber slide extended from the sill floor clear to the fourth floor, the fourth floor being filled up with muck; that the timber slide came to the third floor and had a hoist apparatus—a hand hoist with a chain for fastening to objects, which plaintiff himself had used at times, but that he had always carried his drill, which weighed about 75 pounds, on his shoulder; that the "nipper," who often took machines down, had gone by already that night, and that he might have had to wait all night for him to come around again and to help him; that the only way he could go was that which he used; that after the ladder was broken he had been over the plank a few times in getting steel; that there were no lights, except the candle he used; that he saw no ladder in the stope.

On the defense, the shift boss denied that he had any conversation with Johnson concerning the broken ladder, denied that Johnson had

ever complained to him of any broken ladder, and said that he did not know of the plank which Johnson said he was upon when he fell; that he was in the fourth and third floors soon after the accident, and there was at least 2 feet of space between the wall and ore chute in which to walk by the ore chute on the third floor, and that it was not difficult to go in that way; that the top of the slide chute was 3 to 3½ feet wide, and the bottom where it goes to the ore chute about 2 feet or a little more; that the slide chute was made by Holmi and another man two shifts before the accident; that the way for a man to go was the west end, where there were ladders to the third floor, then east past the timber slide, and then up a ladder at the east end; that the timber slide was used to take machines and such things up to the third floor, and the men were told to take them up the timber slide; that it was clean about the ladder in the east end, when he was there soon after the accident; that he knew the men had gone by way of the east manway; that the east manway was to come up to the rock chute on the second floor; that the rock chute extended from wall·to wall on the third floor; that the slide chute was about 2 feet or more on the third floor, and that a man could not get behind the post there; that there had been a ladder from the second to the third floor before the accident; that it was partly covered at the top that night, and the manway was partly covered.

Lamberton, the nipper, testified that he went up and back by the plank on the night of the accident, but that there were ways on the west by which one could go to the third floor, and then by the chute to the east, and then up; that a man could pass the chute with a drill in his arms; and that there was a windlass in the timber chute.

Another witness, the car man, testified that he had been up to the fourth floor the night before the accident, and that he got there by going up on the west end to the third floor, and then up the ladder at the east end to the fourth floor; that he had built the slide chute with the help of Holmi about two nights before the accident; that it was about 2½ feet wide at the bottom and a foot or more wider at the top; that when he passed it he went on the footwall side and had about 2 feet of space on the footwall; that there was lagging below at the bottom and dirt on top; and that a man could go by with a drill machine.

Ashland, a practical miner, who worked in the mine after Johnson was hurt, testified that he took Johnson's place after the accident, and that he found no ladder from the second to the third floor, and climbed up on a bench and up on a plank upon the fourth floor; that he found the plank or lagging lying flat on top of the cap and down to the bench against the face, with the lower end about a couple of feet below the upper end; that he came down past the slide chute to the west manway, and had no trouble to go by the slide chute, as there was over 2 feet between the slide chute and the wall of the stope; that in walking by the slide chute he walked on plank and some timbers they put over the ore chute; that there was very little muck or rock—about a foot thick on the floor.

The defendant seeks a reversal: (1) Because the court erred in submitting the question of negligence to the jury; (2) because the court

refused to instruct as defendant requested in relation to ways by which plaintiff could have walked; (3) because the court refused to instruct as defendant requested with relation to assumption of risk and appreciation of danger; (4) because the court erred in referring in its charge to the jury to instructions which had been given in a preceding trial; (5) because the court erred in the use of an explanation employed in its instruction upon the use by an employé of a defective implement or dangerous place; and (6) because the court erred by charging the jury in part as follows:

"The plaintiff cannot recover unless the defendant was negligent, and unless such negligence contributed to or caused the accident."

[1, 2] Adverting to the points 1, 2, 3, and 6: In our judgment the case was one well within the principle which made it the duty of defendant to use reasonable care to provide the plaintiff with a safe place in which to work, and to inspect the places where plaintiff was working, and to keep such places and the entrances thereto in reasonably safe condition, and by the indisputable evidence it was no part of the work or duty of the complaining servant to repair or replace defective or broken ladders, which would enable him to go from one place to another.

[3, 4] Whether or not plaintiff could reasonably have used the west manway from the third floor, and in doing so have followed a way to the east manway, yet, merely for his own convenience, and carelessly, chose to use the plankway, involved a consideration of all the evidence in the case, and called for fair deductions from the evidence as matters of fact and not of law. Reference to the evidence shows that Johnson stated that the floor over the ore chute on the third floor was open from one wall over to a place within 8 inches of the other wall, and that in the 8-inch space muck and rock had accumulated, and that there was no chance to get through that way with his drill. It is true the testimony of the defendant was to the effect that there was little or no muck between the slide chute and the wall, and that there was from 2 to 2½ feet of open passageway between the slide chute and the wall. These statements demonstrate serious conflict upon material points. There was also a sharp conflict as to whether Johnson and Shaw, the shift boss, had had any conversation concerning the ladder from the second to the third floor. Johnson says it was broken, and that he told Shaw it was broken, while Shaw says nothing at all was said about the matter. It was for the jury to say which witness was accurate. Gila Valley Railway Co. v. Hall, 232 U. S. 94, 34 Sup. Ct. 229, 58 L. Ed. 521. There was also direct contradiction in the evidence concerning knowledge by the shift boss of the use of the plank at the east end of the stope extending from the bench up to the third floor. Plaintiff's evidence tended to show that he and Holmi used the plank the night before plaintiff was injured, and on the night of the injury, and also that Shaw, the shift boss, went up to the fourth floor that way the night before the accident. On the other hand, Shaw, in effect, said that he did not know that there was a plank, such as plaintiff's witnesses described, and, if there was, he did not know who put it in.

[5, 6] The court, in its instructions, directed the attention of the jury to the fact that there was evidence tending to show that there was another way of going to and coming from the place in the fourth floor where Johnson was at work, and, after stating to the jury that there was a conflict of evidence upon the point, instructed that if the jury found that going by the rock chute or slide was a reasonably safe way, and that plaintiff knew of its existence, and instead of using it, for his own convenience, carelessly used the more dangerous way, then he could not recover, because his injuries would, upon that assumption, be the result of his own carelessness in taking a dangerous way, when one reasonably safe was open for his use. Undoubtedly the more immediate, direct cause of the injury to Johnson was the use of the plank. The theory of the plaintiff, however, is that the ladder having been broken, and having become useless, and having been assured that it would be repaired, plaintiff, in the performance of his duty, had to take his drill down for repair, and having found the rock chute way practically impassable, and having been told to use the plankway, was not careless in going that way, and had a right to assume that his employer had used reasonable care to make the way it directed him to take a safe one. If the defendant was negligent in not furnishing him a safe way—and by a safe way we mean, of course, a way safe, considering the dangers normally incident to the hazardous employment plaintiff was engaged in—plaintiff is not to be regarded as having assumed the risk from a faulty construction or way that is attributable to his employer's lack of proper care, unless he knew of such defect, or unless it was so plainly observable that we must presume he knew of it.

In Seaboard Air Line v. Horton, 239 U. S. 595, 36 Sup. Ct. 180, 60 L. Ed. 458, we have one of the latest expressions of the Supreme Court upon the law applicable to the assumption of risk by an employé who uses a defective appliance under an assurance by his employer that it would be repaired:

"'When the employé does know of the defect (arising from the employer's negligence), and appreciates the risk that is attributable to it, then if he continues in the employment, without objection, or without obtaining from the employer or his representative an assurance that the defect will be remedied, the employé assumes the risk, even though it arise out of the master's breach of duty. If, however, there be a promise of reparation, then during such time as may be reasonably required for its performance, or until the particular time specified for its performance, the employé, relying upon the promise, does not assume the risk, unless at least the danger be so imminent that no ordinarily prudent man under the circumstances would rely upon such promise.'"

In Southwestern Brewery v. Schmidt, 226 U. S. 162, 33 Sup. Ct. 68, 57 L. Ed. 170, the Supreme Court said:

"It is the well-settled law that for a certain time a master may remain liable for a failure to use reasonable care in furnishing a safe place in which to work, notwithstanding the servant's appreciation of the danger, if he induces the servant to keep on by a promise that the source of trouble shall be removed."

For this doctrine the Supreme Court cites its earlier opinion in Hough v. Texas & Pacific Railroad Co., 100 U. S. 213, 25 L. Ed.

612. And in the very late case of Chesapeake & Ohio Railway Co. v. De Atley, 241 U. S. 310, 36 Sup. Ct. 564, 60 L. Ed. 1016 (May 22, 1916), the Supreme Court said:

"According to our decisions, the settled rule is, not that it is the duty of an employé to exercise care to discover extraordinary dangers that may arise from the negligence of the employer or of those for whose conduct the employer is responsible, but that the employé may assume that the employer or his agents have exercised proper care with respect to his safety until notified to the contrary, unless the want of care and the danger arising from it are so obvious that an ordinarily careful person, under the circumstances, would observe and appreciate them."

We agree with the defendant in its argument that plaintiff could not recover under the facts, unless he brought himself within the exception discussed by the Supreme Court, by showing that the defendant company assured him it would replace the broken ladder and that plaintiff continued his work and used the plankway necessarily and in reliance upon such assurance. Regard must be always had to the situation Johnson was in. It was his duty to do his work, and in doing it he had to take his drill, which weighed about 75 pounds, to another level to be repaired. In effect he says he found one way impassable, another out of repair, and that the plankway was the one he had been directed by the shift boss to use. He had been over the plankway himself before he was hurt, and it was for the jury to say whether he was reckless or negligent in taking his drill that way on the night he was hurt. Upon this matter the court charged in part as follows:

"Suppose that you are convinced, first, that at the time of the accident and for a few days prior thereto the defendant had provided no reasonably safe way for the plaintiff and others to use in going to and coming from their place of work, I say, suppose you find such to be the situation, and, second, suppose that the plaintiff was aware of this condition, and, by reason of his age, intelligence, and experience as a miner, he was able to appreciate the perils, then the general principle or rule is that by continuing to use the dangerous way, or one of the dangerous ways, so appreciated, he assumed the risk of injury; that is, by continuing in the employment, he, in effect, said to the defendant that he would not hold it responsible for any accident which might occur from such use. But—and here is the exception heretofore stated in general language—if, under such circumstances, the plaintiff (that is, Mr. Johnson) called the dangerous condition to the attention of the defendant's representative, its shift boss, and the defendant, through the shift boss, thereupon promised to remedy the defect or to provide a safe way, and, in reliance upon such promise, the plaintiff continued to work, and therefore necessarily used a way of getting to his work or coming from it which involved a measure of peril for a time, not of unreasonable duration, and consequently suffered injury on account of such unsafe way, then he is not necessarily debarred from recovering by the general rule of assumption of risk; that is, if there was a promise to provide a safe way, it is for you to say whether under all the circumstances and in view of such promise the plaintiff was wanting in reasonable care in continuing in the employment of the defendant, and, in the course thereof, using the way which he did use in getting to and from his work."

In Kane v. Northern Central Railway, 128 U. S. 91, 9 Sup. Ct. 16, 32 L. Ed. 339, the Supreme Court said:

"It is undoubtedly the law that an employé is guilty of contributory negligence, which will defeat his right to recover for injuries sustained in the

course of his employment, where such injuries substantially resulted from dangers so obvious and threatening that a reasonably prudent man, under similar circumstances, would have avoided them if in his power to do so. He will be deemed in such case to have assumed the risks involved in such heedless exposure of himself to danger. * * * But in determining whether an employé has recklessly exposed himself to peril, or failed to exercise the care for his personal safety that might reasonably be expected, regard must always be had to the exigencies of his position, indeed, to all the circumstances of the particular occasion."

Defendant argues that the complaint made by Johnson to the shift boss was insufficient, and that the assurance of the shift boss, if made at all, was not enough to relieve plaintiff of the assumption of risk incident to the use of the plank. But if the story of the plaintiff was credible, and the jury has accepted it, in very definite way he called the attention of the shift boss to the condition of the ladder, and was told by him that it would be renewed, and was given to understand that renewal would be had very soon, and that until it was replaced or repaired the plank was the proper way to get down to the lower floor.

[7] Defendant urges that the plaintiff assumed the risk by continuing to work after the expiration of a reasonable time within which to replace the ladder between the second and third floors. We believe, however, that under the evidence the question of what was a reasonable time was one for the jury. Without recapitulating the testimony, it is very clear to us that it was not for the court to say that, under all the circumstances, a reasonable time between the assurance to repair and the accident had elapsed. In this respect the case is quite unlike that of Coulston v. Dover Lumber Co. (Idaho) 154 Pac. 636, cited by defendant.

What we have said meets to a great extent the argument of the defendant that a promise to repair does not relieve the servant of assuming the risks incident to the use of instrumentalities of simple construction. We must not lose thought of the fact that Johnson had not complained of any defect in any tool or instrumentality that he was using and which caused his injury. His complaint was that the way by which he reached the point where he had to do his work was not safe. By all logical reasoning, the doctrine of promise to repair or make a way safe applies. As Judge Taft, in Narramore v. Cleveland, etc., R. Co., 96 Fed. 298, 37 C. C. A. 499, 48 L. R. A. 68, said, in referring to the doctrine of assumption of risk, in relation to dangers which the servant agreed, expressly or impliedly, to assume:

"It makes logical that most frequent exception to the application of doctrine by which the employé who notifies his master of a defect in the machinery or place of work, and remains in the service on a promise of repair, has a right of action if injury results from the defect while he is waiting for the repair of the defect, and has reasonable ground to expect it. * * * From the notice and the promise is properly implied the agreement by the master that he will assume the risk of injury pending the making of the repair."

See Labatt on Master and Servant (2d Ed.) § 1345; Highland Boy Gold Mining Co. v. Pouch, 124 Fed. 148, 61 C. C. A. 40; Hermanek v. Chicago & N. W. Railway Co., 186 Fed. 142, 108 C. C. A. 254;

Myhra v. Chicago, M. & P. S. Railway Co., 62 Wash. 1, 112 Pac. 939.

[8] To the contention that the danger in using the plankway was so imminent that the assurance of the shift boss cannot aid the plaintiff's case, the answer is that whether plaintiff was guilty of contributory negligence was. a question to be answered by the jury under the full instructions which were submitted to them. Again we quote from Seaboard Air Line v. Horton, supra, where the court said:

"There is a substantial difference in the attitude of the employé towards the known dangers arising out of defects attributable to the employer's negligence, depending upon whether there has or has not been a promise of repair. It was clearly expressed in a well-reasoned opinion by the Supreme Court of New Jersey (Dowd v. Erie R. R. Co., 70 N. J. Law, 451, 455 [57 Atl. 248, 249]) thus: 'To the rule that the servant assumes the obvious risks of the employment, an exception is made where the master has promised to amend the defect or to make the place safe, and the servant continues the work in reliance upon the promise. * * * The master is exempted from liability in the case of obvious risks for the reason that the servant, by continuing in the employment with knowledge of the danger, evinces a willingness to incur the risk, and upon the principle "volenti non fit injuria." But when the servant shows that he relied upon a promise made to him to remedy the defect, he negatives the inference of willingness to incur the risk.' To relieve the employer from responsibility for injuries that may befall the employé while remaining at his work in reliance upon a promise of reparation, there must be something more than knowledge by the employé that danger confronts him, or that it is constant. The danger must be imminent—immediately threatening—so as to render it clearly imprudent for him to confront it, even in the line of duty, pending the promise."

See Chesapeake & Ohio Ry. Co. v. Proffitt, 241 U. S. 462, 36 Sup. Ct. 620, 60 L. Ed. 1102.

[9] Point 4 in the assignments of error is based upon the refusal of the court to give a requested instruction, substantially as follows: An employé who knows and appreciates the hazard of his service, and the risk which is apparent to ordinary observation, assumes the risk incident to the same, and where the defect is as obvious and well known to the employé as well as to the employer, the employé assumes the risks thereof as one of the ordinary risks of business or employment; and if Johnson was found to have known that the defect or danger was one which he knew and appreciated as well as the defendant, then it was such a risk as he, as an employé, assumed. Careful examination of the charge shows that the court told the jury that if an employé, knowing of a dangerous condition, and by reason of his age and intelligence and experience is able to appreciate the peril from such dangerous conditions in the place where he works, then the general rule is that he impliedly agrees to take the chance and to relieve his employer from responsibility. The jury were again told that if the plaintiff, knowing of the dangerous condition complained of, went ahead and worked and used a dangerous passageway, he could not, under general principles, recover, unless he brought himself within the exception to the rule of assumed risk; the exception being a promise to remedy the defect, or to provide a safe way, and reliance upon such promise.

[10] Error is assigned (5) because the court in its charge to the jury by way of illustration stated that if one of the jurors, being a farmer, employed a farmhand and put into his hands an ax or pitchfork with a cracked handle, and the employé knew nothing about it, and used the device ignorant of the weakness of the handle, and was injured as a consequence, then the employer is held responsible for his negligence in not furnishing him with a reasonably safe device; but if, placing the ax or pitchfork in the hands of his employé, he calls his attention to it, and the employé is able to appreciate, as is the employer, the danger of using the pitchfork or ax in that condition, then, if he goes on and uses it, he can make no complaint if he suffers injury, because he impliedly agrees to take the chance. The illustration by the court was to make plain to the jury the principle that if the plaintiff knew of the dangerous condition of the place, and went ahead and worked there and used a dangerous passageway, he could not recover, unless, as fully explained, he brought himself within the exception to the rule included within the doctrine of assumed risk. We cannot see how the illustration could in any possible way prejudice the rights of the defendant.

What we have said disposes of the more material points in the case. Our conclusion is that the case was properly submitted under correct instructions, and that there was no prejudice to defendant's rights.

Affirmed.

3. BANKRUPTCY ⬅️417(4)—REOPENING ESTATE—HEARING BEFORE REFEREE.
On the hearing of a petition to reopen a bankrupt estate, the referee may properly take judicial notice of facts appearing in his own records of the original case.
[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 871; Dec. Dig. ⬅️417(4).]

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes